Fuchsberg J.
In April of 1972, Miguel Brenes became the subject of an eavesdropping order obtained by the New York City police in the course of its investigation of Brenes’ alleged narcotics violations. Upon the basis of the information garnered from the ^eavesdrop so undertaken, a search warrant was issued and executed. Brenes was thereafter arrested and indicted for narcotics violations. After denial of his motion to suppress the intercepted conversations, derivative physical evidence and inculpatory statements, he pleaded guilty to attempted possession of a dangerous drug in the first degree.
Upon review of the orders denying suppression, a sharply divided panel of the Appellate Division reversed and directed dismissal of the indictment, a majority finding that a "blatant” violation of the minimization requirements of the wiretap statute had occurred and that the appropriate remedy under the circumstances was total suppression of all conversations and the fruits thereof (53 AD2d 78).[1] This appeal by the People is now before us pursuant to leave granted by a dissenting Justice at .the Appellate Division (CPL 460.20, subd 2, par [a]).
In the main, the pertinent facts are as indisputable as they are revealing. Pursuant to the eavesdrop order itself, which named only Brenes as its target and which contained the statutorily required minimization directive,[2] a tap was in *45 stalled on an instrument listed under his name and located at his apartment. At the hearing to suppress, the People offered the testimony of its chief monitoring agent, as well as that of two Assistant District Attorneys who had been instrumental in securing the order. Their evidence showed that, except for a 14-hour period during which an officer, posing as a telephone repairman, entered defendant’s apartment to install a device in its kitchen, the tap was in continuous operation, 24 hours a day, during the 20 days of tapping.
With the help of a mechanical taping device which automatically activated a recorder whenever the subject phone was used, every conversation—some 743 in all—was recorded at full volume. When the chief monitoring agent would man the tapping plant in person, he did occasionally lower the volume of his overhearing device, but he never turned it off and never disconnected the machines, even when calls he overheard were obviously "nonpertinent.” Only during the five to six hours each day when it was thought that Brenes would be asleep was the tapping plant unmanned, but since the machines continued to record all calls, each of which without exception was later replayed, all 29 conversations that took place during the expected sleeping hours were also recorded and replayed. Some conversations were in Spanish; they were later given to two Spanish-speaking officers who were assigned to the case for interpretation. When unmonitored conversations were replayed, they were described in logs that were kept as if they too had been contemporaneously monitored; no distinction was made between calls which were personally monitored and those which were not.
It is not surprising that, because of these indiscriminate practices, there was, and is, no dispute that entirely "innocent” calls were recorded and that, stored on the tapes, are entire conversations whose irrelevancy to the object of the wiretap should have been obvious to any monitor by any screening standard. Some calls involved children, others attorneys, and still others persons unnamed in the order and presumably unconnected in any way with the criminal enterprise under investigation.[3]
*46 Although the order itself did not provide that the tap should cease upon the obtaining of any particular information, the known purpose of the tap, according to the chief monitoring agent, was to locate the subject’s "stash and connection”. As the Assistant District Attorney in charge of supervising the monitoring officers put it, the objective was to obtain sufficient information to make a seizure of narcotics at Brenes’ apartment or elsewhere. However, when examined as to whether that goal in actual practice served as a limitation, he candidly stated that "for the most part” he had "lost control” of the case after the order was obtained. Indeed, at the hearing, the People introduced no evidence at all of any procedure by which any minimization of calls intercepted, listened to, replayed, described or transcribed was essayed.
It appears unnecessary to here review the authoritative expressions of concern for individual rights, running the gamut all the way from Mr. Justice Holmes now classical prescient "dirty business” dissent in Olmstead v United States (277 US 438, 470) to President Carter’s statement only last month (New York Times, May 19, 1977, p 1), that are at the root of the cautions that must be exercised in granting or executing any permissible order for the invasion of private telephonic communications. Sufficient unto this case is reference to the minimization guidelines we recently articulated in People v Floyd (41 NY2d 245), where we stated that, for the People to meet its initial burden to prove legality of such surveillance, they must show that "procedures were established to minimize interception of nonpertinent communications and that a conscientious effort was made to follow such procedures” (41 NY2d, at p 250).
Necessarily, many variables enter into the determination of whether that burden has been met. Obviously, what may be a reasonable procedure and "a conscientious effort” under the circumstances of one investigation may be unjustifiable under others. The nature and scope of an actual investigation in progress; the character and sophistication of the parties who are its targets and the nature of their expected associates; the extent of the official supervision devoted to each step of the *47 surveillance; the possibility and practicality of determining, contemporaneously with their interception, whether particular conversations are in fact pertinent to the objectives of the investigation; these are among the many factors to be taken into account. Ultimately, in each case, the primary question is whether, realistically considered, there was a good faith attempt to affirmatively avoid interception of conversations unrelated to the crime or crimes authorized to be investigated by terms of the court order by leave of which the authorities were acting.
Turning then to whether, under the circumstances in this case, minimization was achieved, we note at the outset that CPL 700.05 (subd 3) specifically defines interception as inclusive of the recording of conversations. Its requirements therefore are equally applicable to conversations which are overheard aurally and those which in the first instance are mechanically recorded.
We reject any suggestion, however, as we did in Floyd (see 41 NY2d, at p 250, n 4, supra), that total interception, be it aural or by tape, constitutes, without more, a per se violation of the statutory and constitutional requirements; in a rare case, a decision to use automatic and continuously operating recording machines might constitute a reasonable effort to achieve lawful seizures by the only practicable procedure available, as, for example, where, due to some peculiarity in the location of the subject phone, a live monitoring agent might be detected, or where, perhaps, a target suddenly and unexpectedly begins to speak in a foreign language that is strange to the community and not subject to interpretation until experts are found. In such situations, courts have found that it may be permissible to protect privacy interests by establishing procedures to minimize perpetuation of the conversations (see, e.g., United States v Manfredi, 488 F2d 588, 600, n 9, cert den 417 US 936, which suggests that erasure of nonpertinent calls might suffice). In the present case, there is no suggestion that any attempt at minimization would have totally frustrated the purposes of the tap.
Thus, the bare statistic that every conversation was intercepted does not control. Rather, as noted, the inquiry must at all times be addressed to whether, despite the fact that some "innocent” conversations were perpetuated, practicable procedures could have been fashioned at its inception to avoid the interception, for it is indiscriminately intrusive conduct by the *48 police that the minimization safeguards seek to control. (See, generally, Comment, Post-Authorization Problems in Use of Wiretaps: Minimization, Amendment, Sealing and Inventories, 61 Cornell L Rev 92.)
With the inquiry thus focused on the evidence of good faith efforts in this case, we hold that, since the record before us indicates not only that no procedures to limit interception were established but none were even attempted, the People have not satisfied their burden.
Specifically, we are not persuaded by the People’s argument that the greater difficulty of determining pertinence in a case involving a target who speaks a foreign language is enough to justify neglect of any éffort to achieve contemporaneous minimization. Certainly, it came as no surprise to the New York City officers who pursued the investigation of defendant’s activities that Brenes and his confederates might speak Spanish on the telephone. In fact, as indicated, two Spanish-speaking officers were assigned for the later indiscriminate interpretation of such conversations; it hardly would have taken much more effort to assign others so qualified to the initial monitoring so that patterns of innocent conversation could have had the protection of early detection and been eliminated from future interception.[4]
Moreover, whatever breadth of interception the order may have authorized, it most certainly did not allow carte blanche surveillance. Nor was the failure to take minimization steps here fortuitous. No attempt to define "pertinence” was ever made and instruction with regard to it is not shown to have been given to the agents who executed the warrant.[5] It goes without saying that, if minimization is to be carried out in good faith, police officers conducting interceptions must know what and how to minimize. Here, once the tap order was signed, the supervising attorney’s loss of "control” left the police officers without his guidance. This was the opposite of *49 what was required. Presearch guidelines—as well as mid-search re-evaluation—by responsible State attorneys are crucial (see United States v Bynum, 360 F Supp 400, 413-414).
Having concluded that total disregard for the minimization requirements imposed by statute offends the constitutionally based prohibition against general searches in which they are rooted (Berger v New York, 388 US 41; Katz v United States, 389 US 347), we now give our attention to the appropriate remedy, a question which has been the subject of considerable debate.
On that question, at least three theories have been advanced by courts and commentators. First, it is urged, on a deterrence rationale, that there should be total suppression when a failure to comply with the statutes has been shown (see, e.g., United States v Focarile, 340 F Supp 1033, 1046-1047 [dictum], affd sub nom. United States v Giordano, 469 F2d 522, affd 416 US 505; People v Castania, 73 Misc 2d 166; People v Holder, 69 Misc 2d 863). A second approach, analogous to the "overextended search” doctrine of search and seizure law, would permit suppression of only those conversations that should not have been intercepted under the wiretap order (see, e.g., United States v Sisea, 361 F Supp 735, 746-747, affd on other grounds 503 F2d 1337, cert den 419 US 1008; People v Solomon, 75 Misc 2d 847 [Scholnick, J.]). the third has been dubbed the "double-standard” approach; it would rest the extent of the remedy on whether minimization was unsuccessful or whether none was attempted at all (United States v Lanza, 349 F Supp 929, 932; United States v Leta, 332 F Supp 1357, 1360; see, generally, Note, Minimization of Wire Interception, 26 Stan L Rev 1411, 1432-1438).
The People urge that, given the difficulty of avoiding interception of nonpertinent conversations, it would be "unduly harsh” to suppress all fruits of an unminimized interception and that such a "blanket suppression rule” would "hamper the effectiveness of a wiretap as a law enforcement tool.” However, though no "blanket rule” need be stated, a distinction must be drawn between, on the one hand, cases where, as here, the order is executed as if in defiance of the existence of statutory and decisional minimization requirements and, on the other, cases where in retrospect it appears that the minimization efforts have merely fallen short. While an unlimited intrusion requires a remedy as broad as the unlawful act, a limited one may not. Since, in our view, the present *50 case falls within the first category, total suppression was warranted (cf. United States v Principie, 531 F2d 1132, 1140, cert den 430 US 905).
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Cooke concur.
Order affirmed.

. Two members of the Appellate Division also would have held the conversations and derivative evidence suppressible on the ground that the wiretap order was improperly issued in its inception. They were of the opinion that the People had failed to make a sufficient showing, as required by CPL 700.15 (subd 4), that "normal investigative procedures” were pursued unsuccessfully or "reasonably appealed] to be unlikely to succeed if tried”. While that issue has been litigated on the present appeal, since our holding on the minimization issue will be dispositive, it is unnecessary for us to reach that question.

. As required by CPL 700.30 (subd 7), the order, dated April 25, 1972, stated that execution of the warrant "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to eavesdropping”. It authorized *45 interception until the expiration date of the order, May 27, 1972. There was no provision for an earlier triggering of termination by the interception of any particular conversation. In fact it was discontinued on May 16.

. Although, at the trial, the District Attorney had estimated that 60% of the calls were "pertinent”—a figure apparently accepted by the Trial Judge—appellant, on the *46 basis of an analysis of the logs and transcripts undertaken for the purposes of the appeal, has concluded that, "[o]f a total of 743 calls, 80 incoming calls received either a busy signal or no answer. Of the remaining 663 calls, only 119 were pertinent” (i.e., accepting the accuracy of the notations in the logs themselves). Of the remaining 544 calls, 132 were in Spanish.

. This would have been perfectly convenient as well as practical. Of New York City’s cosmopolitan population, current statistics published by the Strategy Research Corporation in its annual Spanish Market Analysis indicates that over 1,400,000 of its residents speak Spanish. The wide use of that language has also led to the adoption of a provision of the New York City Civil Court Act (§ 401, subd [d]), which requires that summonses isued in consumer credit transactions be printed in Spanish as well as English.

. The discussion of appropriate guidelines to aid in the formulation of instructions on pertinence in People v Floyd (see 41 NY2d 245, 251-253, supra) makes it unnecessary for us to discuss them here.