**UNITED STATES of America,**

v.

**John FALSETTI and Timothy Soda, Defendants.**

**No. CR–87–211C.**

United States District Court, W.D. New York.

Nov. 29, 1988.

Dennis C. Vacco, U.S. Atty. (Joseph M. Guerra, III, Asst. U.S. Atty., of counsel), Buffalo, N.Y., for the U.S.

Lipsitz, Green, Fahringer, Roll, Schuller & James (Herbert L. Greenman, of counsel), Buffalo, N.Y., for defendant, John Falsetti.

Daniel J. Weinstein, Buffalo, N.Y., for defendant, Timothy Soda.

## INTRODUCTION

CURTIN, District Judge.

The defendants have moved to suppress evidence obtained by the government through the use of a court-ordered wiretap and pursuant to the execution of a search warrant at defendant John Falsetti's residence.[1]

## FACTS

The wiretap at issue in the present case was installed during the course of a joint investigation involving state and federal law enforcement officials.[2] On October 27,

---

**1.** The defendants have also moved to preclude cross-examination by the government concerning prior convictions or alleged bad acts, and to compel disclosure of the substance of any alleged bad acts that the government intends to introduce pursuant to Rule 404(b) of the Federal Rules of Evidence. *See* Item # 15 at ¶¶ 51–52. The government, however, has stated that it does not presently intend to impeach either defendant with any prior convictions, or to introduce any evidence pursuant to Rule 404(b). *See* Item # 18 at 24–25.

**2.** Involved in the investigation were the Niagara County Drug Task Force, the Niagara County Sheriff's Department, the Lockport Police Department, the Niagara Falls Police Department, the Drug Enforcement Administration, and the

1987, Judge Charles Hannigan of Niagara County Court issued an order authorizing the installation of a wiretap on a phone in Falsetti's home pursuant to Article 700 of the New York Criminal Procedure Law. In support of its application, the government had submitted the affidavits of Peter Broderick, the District Attorney of Niagara County, *see* Item # 15, Exhibit B, and Craig Harmon, an investigator with the Niagara County Sheriff's Department who was assigned to the Niagara County Drug Task Force. *See id.*, Exhibits C and D.

Harmon's affidavits enumerated various grounds in support of the contention that Falsetti was engaged in a conspiracy to distribute relatively large quantities of hashish and marijuana.[3] According to Harmon, a reliable confidential informant had told the investigators that he knew a man named Thomas Corsalini who was involved in the distribution of various drugs, including hashish and marijuana, and that Corsalini's source for the drugs was a man named "John" who lived in Lockport, New York. Item # 15, Exhibit D at ¶¶ 8, 9.[4] The informant had witnessed Corsalini place and receive numerous telephone calls to and from John, and during these conversations Corsalini and John would discuss, sometimes in code, the transfer of drugs and cash. Through use of a pen register and examination of telephone company records, the investigators were able to confirm that numerous calls had in fact been made between a phone in Falsetti's home in Lockport and a phone in Corsalini's home during the relevant time period. *Id.* at ¶¶ 9, 17, 26. In addition, the informant stated that

Corsalini had called John while Corsalini was living with the informant, and the informant's telephone bill confirmed that a call had been placed to Falsetti's residence. *Id.* at ¶ 36.

The informant told the investigators that he had accompanied Corsalini on several trips to pick up drugs from John. During these trips, Corsalini would drop off the informant at a convenience store or bar, and return approximately ten minutes later with one or more bales of marijuana weighing twenty to twenty-five pounds each and at least one pound of hashish. Corsalini told the informant that he received the drugs from John on consignment and would pay him with proceeds from sales of the drugs.[5] The informant would then purchase and resell some of the drugs, and would also help Corsalini sell the balance. The informant estimated that Corsalini had purchased from John approximately two hundred pounds of marijuana and eight pounds of hashish during a period of about five months in 1987. *Id.* at ¶¶ 10, 11, 13.

Corsalini told the informant that John worked for a much larger organization based in Arizona and Mexico,[6] and that John, who frequently travelled to Arizona, had planeloads of marijuana and hashish flown into the Niagara County area several times per month. Corsalini also told the informant that John had bribed a United States Customs Official and a New York State Police Investigator to assist him in avoiding arrest: the customs official helped aircraft smuggling drugs from Mexico avoid radar detection, and the investigator screened potential customers to determine

---

Drug Enforcement Administration Task Force. Item # 15, Exhibit B at ¶ 5. The investigators also used information supplied by the Buffalo and Hamburg Police Departments. *See id.*, Exhibit D at ¶ 7.

**3.** In particular, the application alleged reasons to believe that Falsetti was committing crimes involving the possession, distribution, and sale of hashish and marijuana in violation of Articles 105, 220, and 221 of the New York Penal Law. *See* Item # 15, Exhibit C at ¶ 1(a).

**4.** The informant himself had purchased hashish, marijuana, and other drugs from Corsalini on several occasions. Item # 15, Exhibit D at ¶ 8.

**5.** The informant also stated that he had observed Corsalini in possession of large sums of cash before leaving to meet John, and that Corsalini did not have the money when he returned. Item # 15, Exhibit D at ¶ 11. It is not clear from Harmon's affidavit if the informant was speaking of the same occasions on which he saw Corsalini return with the bales of marijuana.

**6.** According to Corsalini, John had bragged that the operation had netted over two million dollars in gross sales in 1986, and that it would gross approximately six million dollars in 1987. Item # 15, Exhibit D at ¶ 13.

whether they were police informants or had pending criminal charges. *Id.* at ¶¶ 12, 13, 31.

The informant gave several indications that his information was reliable. For example, in September, 1987, the informant told the Drug Enforcement Administration ("DEA") that Corsalini had been in an automobile accident and that the police had towed his car before he could remove three pounds of marijuana and a gun from inside the vehicle. The DEA subsequently contacted the Buffalo Police Department, which then recovered the marijuana and a stolen rifle from the car. *Id.* at ¶ 14.[7] A warrant was subsequently issued for Corsalini's arrest, and, according to the informant, Corsalini fled to Florida. Approximately one month after the seizure from Corsalini's car, the informant advised the DEA that Corsalini was returning to Buffalo on a commercial flight and would be armed. When the police were notified, they responded to the airport and arrested Corsalini on the outstanding charges. They also recovered a weapon from him. *Id.* at ¶¶ 15, 16.[8]

In his affidavit, Harmon also asserted that Falsetti had been arrested at least three times and had at least one narcotics-related conviction, and that at the time of one of the arrests over fourteen thousand dollars and small amounts of cocaine and marijuana were recovered from a vehicle in which Falsetti was a passenger. *Id.* at ¶¶ 18, 19, 21. Harmon also stated that he had learned that other reliable informants had advised other law enforcement officials that they knew Falsetti to be involved in the distribution of cocaine and marijuana. *Id.* at ¶¶ 23, 25.[9]

In support of the wiretap application, Harmon also maintained that, based on his

experience, normal investigative techniques would prove either futile or too dangerous for several reasons.

First, he stated that drug traffickers normally do not keep permanent records of their trade, and that, in any event, even if such records were obtainable they would likely be coded and, consequently, useless as an investigative tool. Item # 15, Exhibit C at ¶ 1(a). Second, he claimed that physical surveillance would prove fruitless because of the secretive nature of the drug trafficking being investigated, and because the Niagara County Drug Task Force, consisting of only five investigators, was too small to prevent detection by the targets of any surveillance. *Id.* at ¶ 1(b). Third, he claimed that the use of undercover agents was impossible, although he did not explain why. *Id.* at ¶ 1(c). Fourth, he stated that the investigators did not have any informants who knew Falsetti. *Id.* at ¶ 1(d). Fifth, Harmon asserted that sufficient evidence to prove the nature and scope of Falsetti's organization could only be obtained through use of a wiretap, although he again did not explain why. *Id.* at ¶ 2.

Through use of the wiretap, the investigators determined that defendant Timothy Soda would be delivering a shipment of marijuana for Falsetti to the home of a man named Richard McNatty in Colden, New York, on November 23, 1987. Item # 2, Affidavit of Gregory McCoy at ¶¶ 3, 4; Item # 15, Exhibit G, Affidavit of Craig Harmon at ¶¶ 4–6. At approximately 5:45 p.m. on November 23, Soda was observed arriving at McNatty's house in a station wagon, and approximately thirty minutes later Falsetti was observed arriving in another car that he parked next to Soda's car. Falsetti then removed a bag from the trunk of his car and went inside the house. At

---

7. The police also recovered scales, a wallet, and identification belonging to Corsalini. Item # 15, Exhibit D at ¶ 14.

8. Harmon's affidavit does not specify what type of weapon was recovered. Harmon stated that Corsalini was also found in possession of a hypodermic needle and "pills." Item # 15, Exhibit D at ¶ 16.

9. Harmon states in his affidavit that a man identified by one of these informants as having

previously worked with Falsetti was serving a three-year prison sentence for a narcotics-related conviction. Item # 15, Exhibit D at ¶¶ 23, 24.

Harmon also asserts in his affidavit that numerous telephone records indicated that Falsetti had made several calls to individuals known to be involved or to have been previously involved in the distribution of various drugs. *Id.* at ¶¶ 28, 29, 30; *see also id.* at ¶ 33.

approximately 8:00 p.m., Soda and Falsetti came out of the house and began putting bags into the trunk of Falsetti's car. Soda and Falsetti were then arrested; McNatty, who was also outside at the time, was also arrested. Agents then entered McNatty's house and recovered bags containing approximately fifty-seven pounds of marijuana. The agents also recovered a digital scale and two bags containing a total of approximately thirty-one pounds of marijuana from Falsetti's car, and bags containing a total of seventy-two pounds of marijuana from Soda's car. Item # 2, Affidavit of Gregory McCoy at ¶¶ 7–11.

Later that night, the investigators executed a search warrant authorized by Judge Hannigan for Falsetti's home. Although it is unclear from the parties' papers exactly what was recovered, it appears that the agents found records pertaining to Falsetti's alleged drug-distribution ring. *See id.* at ¶ 12.

## DISCUSSION

### A) *The Wiretap*

#### i. *Minimization*

The defendants have requested a hearing to determine whether the government properly minimized intercepted conversations. *See* Item # 15 at ¶¶ 6(f), 7–8. The government has responded that the conversations were properly minimized, and that a hearing is neither required nor necessary. *See* Item # 18 at 2–9.

█ Since the investigation in the present case included state officials acting pursuant to a state wiretap statute, and since the minimization requirement contained in the New York statute is intended to protect a person's right to privacy, *see,*

*e.g., People v. Floyd,* 41 N.Y.2d 245, 249, 392 N.Y.S.2d 257, 360 N.E.2d 935 (1976), New York law will control to the extent that it is more stringent than federal law governing minimization. *See United States v. Lilla,* 699 F.2d 99, 102 n. 3 (2d Cir.1983); *United States v. Sotomayor,* 592 F.2d 1219, 1225 (2d Cir.), *cert. denied,* 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979). *See also United States v. Lilla,* 534 F.Supp. 1247, 1253–54 (N.D.N.Y.1982), *rev'd on other grounds,* 699 F.2d 99 (2d Cir.1983). *Compare United States v. Eyerman,* 660 F.Supp. 775, 778–80 (S.D.N.Y. 1987) (federal law controls where investigation of federal crime through use of wiretap is conducted by federal agents without any involvement of state authorities); *People v. Griminger,* 71 N.Y.2d 635, 529 N.Y. S.2d 55, 524 N.E.2d 409 (1988) (state law controls where fruits of search conducted pursuant to warrant issued by federal magistrate are used in subsequent state prosecution). The court can, however, look to federal law for guidance if New York law supplies inadequate information on a particular issue. *United States v. Hinton,* 543 F.2d 1002, 1011 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *See also United States v. Lilla,* 699 F.2d at 102 ("For practical purposes the federal and New York statutory requirements [regarding minimization] are the same.") (footnote omitted); *People v. McGrath,* 46 N.Y.2d 12, 26, 412 N.Y.S.2d 801, 385 N.E.2d 541 (1978), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1535, 59 L.Ed.2d 788 (1979) ("The New York eavesdropping statute was intended to conform 'State standards for court authorized eavesdropping warrants with federal standards.'") (citations omitted).[10]

---

10. Although neither the defendants nor the government have argued that New York law is more stringent than federal law on this issue, both have cited New York law in support of their arguments. *See* Item # 15 at ¶ 8; Item # 18 at 3–8.

Contrary to the claim by the government, however, it is not at all clear that the standards for judging compliance with the minimization requirement are "identical" under federal and state law. *See* Item # 18 at 3. Although both cases cited by the government refer to the near-

ly identical wording of the federal and state wiretap statutes, neither case held that the New York statute should therefore be interpreted and applied according to federal case law construing the federal statute. Indeed, *United States v. Manfredi,* 488 F.2d 588 (2d Cir.1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974), was decided before the New York Court of Appeals interpreted the minimization requirement of the New York statute. In *People v. Floyd,* 41 N.Y.2d 245, 392 N.Y.S.2d 257, 360 N.E.2d 935 (1976), the New York Court of Ap-

New York Criminal Procedure Law Section 700.30(7) provides in relevant part that eavesdropping must be conducted "in such a way as to minimize the interception of communications not otherwise subject to eavesdropping under this article." In *People v. Floyd, supra,* the New York Court of Appeals defined minimization as "a good faith and reasonable effort to keep the number of nonpertinent calls intercepted to the smallest practicable number," and held that whether minimization has been achieved in a given case depends on "the scope and circumstances of the particular investigation under review." 41 N.Y.2d at 250, 392 N.Y.S.2d 257, 360 N.E.2d 935. The court ruled that the prosecution has the burden of going forward to show minimization had been achieved, and that this burden may be satisfied "by demonstrating that procedures were established to minimize interception of nonpertinent communications and that a conscientious effort was made to follow such procedures." *Id.*

■ In *People v. Brenes,* 42 N.Y.2d 41, 396 N.Y.S.2d 629, 364 N.E.2d 1322 (1977), the court, while identifying "indiscriminately intrusive conduct" as the evil which the minimization requirement sought to prevent, *id.* at 47–48, 396 N.Y.S.2d 629, 364 N.E.2d 1322, enumerated several factors that should be considered in determining what constitutes a "reasonable procedure" [11] and a "conscientious effort":

> The nature and scope of an actual investigation in progress; the character and sophistication of the parties who are its targets and the nature of their expected associates; the extent of the official supervision devoted to each step of the surveillance; the possibility and practicality of determining, contemporaneously with their interception, whether particular conversations are in fact pertinent

to the objectives of the investigation; these are among the many factors to be taken into account. Ultimately, in each case, the primary question is whether, realistically considered, there was a good faith attempt to affirmatively avoid interception of conversations unrelated to the crime or crimes authorized to be investigated....

*Id.* at 46–47, 396 N.Y.S.2d 629, 364 N.E.2d 1322. Ultimately, it is the defendant who bears the burden of persuasion. *People v. Floyd,* 41 N.Y.2d at 250, 392 N.Y.S.2d 257, 360 N.E.2d 935; *People v. Di Stefano,* 38 N.Y.2d 640, 652, 382 N.Y.S.2d 5, 345 N.E.2d 548 (1976).

■ Viewed in light of these standards, the record establishes that the government has met its burden and that no hearing is necessary. The affidavits submitted to Judge Hannigan describe a relatively large drug-distribution ring that utilized coded phone conversations, had sources in Arizona and in Mexico, and may have included corrupt federal and state officials. Consequently, the investigators were entitled to broader surveillance than otherwise would have been appropriate, particularly during the early stages of the investigation. *See People v. Floyd,* 41 N.Y.2d at 251–52, 392 N.Y.S.2d 257, 360 N.E.2d 935; *People v. Brenes,* 42 N.Y.2d at 46, 396 N.Y.S.2d 629, 364 N.E.2d 1322. *See also Scott v. United States,* 436 U.S. 128, 140–41, 98 S.Ct. 1717, 1724–25, 56 L.Ed.2d 168 (1978). Moreover, the tapped phone was located in a residence whose occupants were suspected of participating in the conspiracy. It was reasonable, therefore, to monitor more calls than would likely have been necessary had the tap been installed, for example, on a public phone. *See Scott v. United States,* 436 U.S. at 140, 98 S.Ct. at 1724.

---

peals, while noting the nearly identical wording of the two statutes, did not declare that it considered its interpretation of the New York minimization requirement to be the same as either federal court interpretations of the federal statutory requirement or prior federal court interpretations of the state statutory requirement. In fact, the court freely cited numerous sources in the process of interpreting New York's minimization requirement.

**11.** While the court stated in *People v. Floyd* that the prosecution "may" satisfy its burden by demonstrating that such procedures were established, 41 N.Y.2d at 250, 392 N.Y.S.2d 257, 360 N.E.2d 935, six months later in *People v. Brenes* it read *Floyd* to state that such procedures "must" be established. 42 N.Y.2d at 46, 396 N.Y.S.2d 629, 364 N.E.2d 1322.

Furthermore, a significant number of calls were, in fact, minimized. *See People v. Floyd*, 41 N.Y.2d at 252, 392 N.Y.S.2d 257, 360 N.E.2d 935 (statistical evidence relevant when determining whether minimization requirement has been satisfied); *People v. Di Stefano*, 38 N.Y.2d at 652, 382 N.Y.S.2d 5, 345 N.E.2d 548 (same). Of the 988 calls that were monitored from October 27, 1987, to November 23, 1987, 178, or 18%, were pertinent. Of the remaining 810 nonpertinent calls, 190, or 24%, were minimized. Excluding the at least 111 monitored calls that were busy signals, unanswered, or otherwise incomplete, *see People v. Floyd*, 41 N.Y.2d at 252, 392 N.Y.S.2d 257, 360 N.E.2d 935, 27% were minimized;[12] further excluding the 127 nonpertinent completed calls which were of short duration, *see id.* at 253, 392 N.Y.S.2d 257, 360 N.E.2d 935, 33% were minimized. *See* Item # 18 at 7–9.

These figures hardly bespeak "indiscriminately intrusive conduct" by law enforcement officials. Although a majority of the recorded calls were nonpertinent, in an investigation such as the one undertaken here—where the targets and potential targets often speak in code or are otherwise discreet when they speak—it is reasonable for law enforcement officials to listen longer and to record more calls than otherwise might be appropriate in an effort to ascertain the scope of the conspiracy. *See People v. Floyd*, 41 N.Y. at 250, 392 N.Y.S.2d 257, 360 N.E.2d 935 ("Courts examining interceptions in retrospect cannot fairly expect government agents to be possessed of clairvoyant powers in foreseeing in advance the relevance of particular communications to the crimes under investigation.")

In any event, the New York Court of Appeals has noted that even the interception of all conversations would not, per se, violate the minimization requirement. *See People v. Floyd*, 41 N.Y.2d at 250 n. 4, 392 N.Y.S.2d 257, 360 N.E.2d 935. *See generally Scott v. United States, supra.* Here, not only were a significant number of calls minimized, but the defendant, who has

been supplied with copies of all intercepted conversations and related logs, has failed even to suggest why it was unreasonable for the government not to have minimized more of the remaining calls.

Further evidence of the reasonableness of the procedures employed by the investigators is the fact that the wiretap operation was closely monitored by Judge Hannigan. During the twenty-eight days that the wiretap was operating, the investigators supplied the judge with eight progress reports. This supervision, which is clearly preferred by the New York Court of Appeals, *People v. Floyd*, 41 N.Y.2d at 253, 392 N.Y.S.2d 257, 360 N.E.2d 935, "is strongly supportive of the claim that the minimization requirement has been satisfied." *Id.*

Consequently, the record establishes not only that the investigators made a good faith and reasonable effort to minimize the number of calls they intercepted, but also that they, in fact, sufficiently minimized those calls. Furthermore, "[i]n the absence of any evidence that a substantial number of nonpertinent conversations [were] intercepted unreasonably," *United States v. Cirillo*, 499 F.2d 872, 881 (2d Cir.), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974), no hearing is necessary.

*ii. Use of Normal Investigative Procedures*

The defendants also contend that the investigators failed to demonstrate that normal investigative procedures could not have been employed. *See* Item # 15 at ¶¶ 10–25. This argument is also without merit.

■ Criminal Procedure Law Section 700.15(4) provides that an eavesdropping warrant should not be issued unless it is first shown that "normal investigative procedures have been tried and have failed, or reasonably appear to be unlikely to succeed if tried, or to be too dangerous to employ."

---

**12.** The government makes three references to such calls without stating their quantity. *See* Item # 18 at 8–9.

*See also* Crim.Proc.L. § 700.20(2)(d). This requirement was designed to ensure that electronic surveillance would be used "with restraint," and "not ... routinely employed as the initial step in criminal investigation." *United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974). *See also United States v. Lilla*, 699 F.2d at 102–03. It does not, however, dictate that all other possible means of investigation must be exhausted, *United States v. Terry*, 702 F.2d 299, 310 (2d Cir.), *cert. denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *United States v. Fury*, 554 F.2d 522, 530 (2d Cir.1977), *cert. denied*, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978); *People v. Versace*, 73 A.D.2d 304, 426 N.Y.S.2d 61, 64 (App.Div. 2d Dep't 1980), or even that any particular investigative procedure be exhausted. *United States v. Lilla*, 699 F.2d at 104. Indeed, investigators need not employ traditional surveillance techniques that would, for example, be impractical, costly and inconvenient, *United States v. Lilla*, 699 F.2d at 102, *United States v. Fury*, 554 F.2d at 530 n. 7, or clearly unproductive. *United States v. Terry*, 702 F.2d at 310. Rather, "the requirement is 'simply designed to assure that wiretapping is not resorted to in situations where traditional investigation techniques would suffice to expose the crime.'" *United States v. Fury*, 554 F.2d at 530, *quoting United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974).

In short, "wiretaps are 'neither a routine initial step nor an absolute last resort,'" *United States v. Lilla*, 699 F.2d at 104 (citation omitted), and to withstand constitutional attack the government must establish that less intrusive investigative procedures were not feasible, *id.* at 103, and that the wiretap was not merely "a useful additional tool," *People v. Brenes*, 53 A.D.2d 78, 385 N.Y.S.2d 530, 532 (App.Div. 1st Dep't 1976), *aff'd*, 42 N.Y.2d 41, 396 N.Y.S.2d 629, 364 N.E.2d 1322 (1977), used as "a substitute for standard investigative procedures." *United States v. Lilla*, 699 F.2d at 105.

■ Applying these principles in a practical and common-sense manner, *United States v. Lilla*, 699 F.2d at 103; *People v. Versace*, 426 N.Y.S.2d at 64, and giving deference to the discretion of the issuing judge, *see United States v. Ruggiero*, 726 F.2d 913, 924 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984),[13] the government has met its burden. Harmon related in one of his affidavits that, by the time of the application, the investigators had used an undercover informant extensively, Item # 15, Exhibit D at ¶¶ 8–16, 36; had checked New York State Department of Motor Vehicle records, *id.* at ¶ 6; had initiated an inventory search of Corsalini's car, *id.* at ¶ 14; had subpoenaed and examined long distance toll records for Corsalini's home phone, *id.* at ¶ 17; had obtained subscription data regarding Falsetti's home phone from the security department of the New York Telephone Company, *id.;* had obtained information regarding prior arrests of Falsetti and of others suspected of being associates of his, *id.* at ¶¶ 18–22, 24, 28; had obtained information from other allegedly reliable informants regarding Falsetti's distribution of drugs, *id.* at ¶¶ 23, 25; and had utilized a pen register on Falsetti's home phone. *Id.* at ¶¶ 26–34.

In addition to explaining the investigative procedures the agents had already employed, Harmon, as noted above, offered several reasons why additional techniques short of a wiretap would prove either fruitless or too dangerous to employ. Putting aside those portions of his affidavit which contain merely conclusory statements, *see* Item # 15, Exhibit C at ¶¶ 1(c), (2), Harmon explained that: 1) any records that could be seized would likely be coded and, therefore, useless; 2) physical surveillance would be pointless because the conspirators usually concealed their transactions and because the task force responsible for the investigation was too small to prevent detection; and 3) the investigators did not have any

---

**13.** The Ninth Circuit has referred to the discretion to which the issuing judge is entitled as "considerable." *United States v. Martin*, 599 F.2d 880, 886–87 (9th Cir.), *cert. denied*, 441 U.S. 962, 99 S.Ct. 2408, 60 L.Ed.2d 1067 (1979).

informants who knew Falsetti. *Id.* at ¶¶ 1(a), 1(b), 1(d).

The defendants argue, nonetheless, that the investigators "apparently" never tried to use their main informant to conduct surveillance of Corsalini or of Falsetti's house. *See* Item # 15 at ¶ 16; *see also id.* at ¶ 18. To claim that the informant was not used for surveillance of Corsalini, however, is truly baffling, for Harmon's affidavits clearly establish that, in fact, the informant was used extensively to observe Corsalini and to gain information from him. Moreover, it is also clear from the record that Corsalini took deliberate steps to hide Falsetti's identity from the informant;[14] consequently, any attempts by the informant to gain access to or to obtain information about Falsetti most likely would have met with suspicion, thereby possibly jeopardizing the investigation as well as the informant's safety.

The defendants question, however, whether agents other than those formally assigned to the task force were available to conduct surveillance prior to the issuance of the wiretap order, *see id.* at ¶ 17, since it appears that additional agents were used when the defendants were arrested and, presumably, when Falsetti's house was searched. Indeed, the government does not appear to challenge the defendants' assertion that physical surveillance of Falsetti's residence was feasible;[15] rather, the Government argues that physical surveillance would not have revealed information regarding such matters as the identity of Falsetti's out-of-state connections and potentially corrupt law enforcement officials. *See* Item # 18 at 11–12.

The government certainly cannot avail itself of electronic surveillance to which it otherwise would not be entitled simply by limiting the number of agents it assigns to a given investigation, thereby restricting the range of alternative investigative procedures that can be employed before an application for a wiretap is made. It is not unusual, however, for extra personnel to be utilized at the time of arrest. Yet this does not mean that they therefore must have been available for intensive use during the preceding investigation. In any event, in the present case it appears that at the time Judge Hannigan issued his order the investigation had reached a point at which the availability of additional agents would not have obviated the need for a wiretap in order to ascertain the scope of the suspected conspiracy. The investigation had uncovered information indicating that Falsetti was part of a relatively large drug-distribution ring that had sources in Arizona and in Mexico, and which may have involved corrupt federal and state officials.[16] Moreover, the source of the bulk of the government's information up to that point—Corsalini—had been arrested, obviously limiting severely the government's ability to uncover additional information without the use of a wiretap.

Viewed in totality, the record thus establishes that the wiretapping of Falsetti's phone was justified in light of the efforts previously made by the task force to utilize normal investigative procedures. Consequently, Judge Hannigan did not abuse his discretion.

### *iii. Probable Cause*

██ The defendants next argue that the investigators did not establish probable cause in support of the wiretap application. *See* Item # 15 at ¶¶ 6(a), (b), (c), (h), 26–34. Although their papers are somewhat ambiguous, the defendants appear to offer

---

14. For example, Corsalini did not give "John's" last name to the informant, and would not let the informant accompany him when he picked up drugs from John. *See* Item # 15, Exhibit D at ¶¶ 9–11.

15. The affidavit of DEA Agent Gregory McCoy establishes that the government obviously was able to conduct surveillance of at least McNatty's house the day the defendants were arrested. *See* Item # 2.

16. It is unclear, however, why the government decided to arrest the defendants before additional information had been learned about the identity of others involved in the conspiracy, although the agents may have believed that any searches conducted after the arrests would uncover such information.

arguments that would support a challenge only under Section 700.15(2) of the Criminal Procedure Law. *See id.* at ¶¶ 26–34.[17] In any event, the record establishes that probable cause existed in full satisfaction of Section 700.15.

In *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the United States Supreme Court established a two-pronged test to determine whether a finding of probable cause could be based on hearsay: first, the basis of an informant's knowledge must be established; second, either the credibility of the informant or the reliability of his information must also be established. *Aguilar v. Texas*, 378 U.S. at 114, 84 S.Ct. at 1514; *Spinelli v. United States*, 393 U.S. at 412–13, 89 S.Ct. at 586–87. In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Court overruled the *Aguilar–Spinelli* test, holding that information supplied by a hearsay informant should instead be judged in light of the "totality-of-the-circumstances." *Id.* at 238, 103 S.Ct. at 2332.

The New York Court of Appeals, however, has consistently refused to adopt the *Gates* rule in a variety of contexts, holding that under the state constitution the more restrictive *Aguilar-Spinelli* test still applied. *See People v. Griminger*, 71 N.Y.2d 635, 529 N.Y.S.2d 55, 524 N.E.2d 409 (1988) (search warrants); *People v. P.J. Video, Inc.*, 68 N.Y.2d 296, 508 N.Y.S.2d 907, 501 N.E.2d 556 (1986), *cert. denied*, 479 U.S. 1091, 107 S.Ct. 1301, 94 L.Ed.2d 156 (1987) (search warrants for obscene materials); *People v. Johnson*, 66 N.Y.2d 398, 497 N.Y. S.2d 618, 488 N.E.2d 439 (1985) (warrantless arrests and searches). Although the New York Court of Appeals has yet to address the specific issue of whether the *Aguilar-Spinelli* test should be applied when determining whether probable cause

has been established in support of a wiretap application through the use of hearsay, there is no sound reason to believe that the court would adopt a different rule in this context in light of its consistent refusal to do so in others.[18] *See United States v. Fury*, 554 F.2d at 530 ("This standard of probable cause [under Article 700] is the same as the standard for a regular search warrant."); *People v. Di Stefano*, 38 N.Y.2d at 648, 382 N.Y.S.2d 5, 345 N.E.2d 548 ("[E]avesdropping warrants are based on substantially the same principles applicable to search warrants for physical evidence.")

The defendants do not challenge the reliability of the government's main informant; their argument rests instead on a challenge to the credibility and reliability of the informant's source—Corsalini. *See* Item # 15 at ¶ 29. Their argument, therefore, attacks the basis of the main informant's knowledge, *see Spinelli v. United States*, 393 U.S. at 416, 89 S.Ct. at 589, although, in this context, analysis of their claim necessarily involves applying to Corsalini the factors comprising the second prong of the *Aguilar-Spinelli* test.

The government, however, has sufficiently demonstrated the reliability of Corsalini's information. Through independent investigation, the government was able to corroborate much of the information supplied by Corsalini. *See People v. Johnson*, 66 N.Y.2d at 403, 497 N.Y.S.2d 618, 488 N.E.2d 439 (corroboration of details through independent investigation can verify reliability of hearsay). Corsalini told the informant that his supplier was a man named "John" who lived in Lockport with two children and a wife named "Jean," and the task force was able to verify that Falsetti and his wife "Jeanie" lived in Lockport with their two children, and that numerous calls were placed between the

**17.** That portion of the statute provides that one of the prerequisites for issuance of a wiretap order is that there be "probable cause to believe that a particularly described person is committing, has committed, or is about to commit a particular designated offense." Interestingly, the defendants do not contest that the man

identified by Corsalini as "John" is, in fact, Falsetti.

**18.** The court thus refuses to adopt the holding of *United States v. Feola*, 651 F.Supp. 1068, 1091–93 (S.D.N.Y.1987), on this issue.

home phones of Corsalini and Falsetti.[19] Moreover, Falsetti lived in the vicinity of the location where Corsalini dropped off the informant before picking up shipments of marijuana and hashish. *See* Item # 15, Exhibit D at ¶¶ 10–13, 17, 26. Corsalini also told the informant that Falsetti's source was located in Arizona, that Falsetti had marijuana and hashish flown into the Niagara County area several times per month, and that Falsetti worked for an organization based in Arizona and Mexico. Harmon, who knew from his training and experience that Arizona was a source of marijuana and hashish imported into the United States from Mexico, learned that Falsetti had previously been arrested in Arizona for possession of "74 bricks" of marijuana in 1976.[20] He also learned that another informant[21] had identified Falsetti as a trafficker in substantial quantities of marijuana who had the drug flown into the Niagara County area, and who, as of June 1987, was storing thirteen tons of marijuana in Arizona. *See id.* at ¶¶ 12, 13, 18, 25, 35.

In addition, Harmon's investigation determined that another informant previously had identified Falsetti and another man, who at the time of the wiretap application was incarcerated for a narcotics-related conviction, as dealers in large quantities of cocaine and marijuana in the nearby Hamburg, New York, area. *See id.* at ¶¶ 23–24.

Giving due deference to the determination of the issuing judge, *see Aguilar v. Texas*, 378 U.S. at 111, 84 S.Ct. at 1512; *Spinelli v. United States*, 393 U.S. at 419, 89 S.Ct. at 590; *United States v. Ruggiero*, 726 F.2d at 924; *People v. Griminger*, 71 N.Y.2d at 640, 529 N.Y.S.2d 55, 524 N.E.2d 409, the government has thus demonstrat-ed that the wiretap order was based on probable cause.

B) *The Search Warrant*

■ The defendants have also challenged the validity of the search warrant for Falsetti's residence issued by Judge Hannigan. *See* Item # 15 at ¶¶ 41–50.

The fruits of the wiretap and the prior investigation conducted by the task force, however, amply establish that there was probable cause to believe that Falsetti was involved in a conspiracy to distribute marijuana and that a shipment of the drug would arrive on November 23, 1987. Consequently, even under the relatively stringent requirements of state law, *see People v. Griminger, supra*, it was proper for Judge Hannigan to authorize the search of Falsetti's house. *See also United States v. Fama*, 758 F.2d 834, 838 (2d Cir.1985); *United States v. Young*, 745 F.2d 733, 758 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). Furthermore, the search warrant does not appear overly broad in any material respect.

Accordingly, the defendants' motions to suppress are denied.

So ordered.

---

**19.** Furthermore, according to the informant, the informant's phone bill reflected that a call had been placed from the informant's home phone to Falsetti's home phone during a period in which Corsalini had been living with the informant and using his phone to contact the supplier. *See* Item # 15, Exhibit D at ¶ 36.

**20.** That arrest led to a conviction for which Falsetti was sentenced to probation. *See* Item # 15, Exhibit D at ¶ 18. As noted above, when Falsetti was arrested on another occasion, small amounts of cocaine and marijuana and over fourteen thousand dollars in cash were recovered from the vehicle in which he was a passenger. *Id.* at ¶ 21.

**21.** The defendants have not challenged the credibility, reliability, or basis of knowledge of any of the unnamed informants mentioned in Harmon's affidavits.