OPINION OF THE COURT
Steven L. Barrett, J.
Overview
This court previously inspected the grand jury minutes and found that there was legally sufficient evidence establishing all of the charges against all of the abovenamed defendants. The evidence presented to the grand jury established sufficiently that defendants, all of whom were New York City police officers and/or PBA (Patrolmen’s Benevolent Association) delegates or trustees, engaged in a scheme involving the fixing[1] of summonses given for illegal parking and for moving violations. As will be discussed, the investigation into ticket-fixing was an outgrowth of an earlier investigation into the illegal activities of Police Officer Jose Ramos (who is separately indicted) which *413 included, amongst other activities, the sale of large quantities of marijuana and counterfeit DVDs from two barbershops in the Bronx owned by Ramos, as well as a robbery, a burglary and insurance fraud. The investigation into Ramos’ illegal activities included the use of court-authorized eavesdropping on Ramos’ cell phone. During the course of the eavesdropping on Ramos, a number of conversations were intercepted in which Ramos was overheard communicating with fellow police officers in order to fix summonses for moving violations that had been issued to people known to Ramos. Those interceptions formed the basis for this court’s order, issued on December 23, 2009, authorizing eavesdropping on Police Officer Virgilio Bencosme’s cell phone, this court having found that there was probable cause to believe that Bencosme’s phone had been used and would continue to be used in furtherance of the crime of grand larceny in the fourth degree and the conspiracy and the attempt to commit this crime. Following the December 23, 2009 order authorizing eavesdropping on Bencosme’s phone, this court authorized wiretaps to investigate ticket-fixing on 16 additional mobile telephones operated by 13 other Bronx police officers who were either delegates or officers of the Bronx PBA or SBA (Sergeants Benevolent Association). The eavesdropping, which ended on December 14, 2010, resulted in the interception of over 10,000 telephone conversations and text messages.
Defendants now move to suppress all or some of the eavesdropping evidence claiming that: (1) the Bencosme eavesdropping application failed to set forth a sufficient statement demonstrating that eavesdropping was necessary to investigate ticket-fixing;[2] (2) eavesdropping to obtain evidence of grand larceny in the fourth degree is not authorized by the federal wiretapping statute, and therefore, under the Supremacy Clause of the Federal Constitution and federal preemption doctrine, this court could not authorize eavesdropping to investigate the suspected larceny of summonses; (3) the December 23, 2009 eavesdropping application failed to establish probable cause to *414 believe that evidence of grand larceny in the fourth degree would be obtained in the following 30-day period through eavesdropping on Bencosme’s cell phone; and (4) the People failed to comply with the procedures for retroactively amending the warrant. In the alternative, if the court does not suppress the eavesdropping evidence, defendants move for a Franks/Alfinito hearing based on their contention that the affidavits in support of the eavesdropping warrants included false and misleading statements and omissions with respect to the necessity for eavesdropping. For all the reasons given below, defendants’ motion is denied in its entirety.
I. The Necessity Requirement
Prior to obtaining the court’s authorization to eavesdrop on Bencosme’s cell phone, the People were required, inter alia, to establish that eavesdropping was necessary to investigate an offense specifically designated in CPL article 700, in this instance, grand larceny in the fourth degree. (See CPL 700.20 [2] [d]; 700.15 [4].) To satisfy this requirement the People submitted, as part of their December 23, 2009 application to eavesdrop on Bencosme’s cell phone, the affidavit of Sergeant Ramon Valdez, which contained several paragraphs that listed both the conventional investigative techniques that were tried and failed to achieve the objectives of the investigation, and the conventional investigative techniques that were not attempted because they allegedly would be unlikely to succeed. Although the Valdez affidavit contains some irrelevant and extraneous information with respect to why eavesdropping was necessary, it nonetheless established sufficiently that normal investigative procedures were either exhausted prior to the application to eavesdrop or (as to those not attempted) unlikely to be successful, and that eavesdropping was therefore necessary to achieve the goals of the investigation. In reaching this conclusion the court has carefully reexamined the Valdez affidavit.[3] This reexamination, however, has not been done in a vacuum. Rather, it has been done in light of the objectives of the investigation into ticket-fixing, the nature and character of the crime being investigated, the technology employed in the commission of the crime, and the character of the targets of the investigation. Moreover, it has been done with an eye toward the context in *415 which the interceptions began.
Thus, before examining the issues which constitute the controlling points regarding the necessity requirement for the eavesdropping conducted once the extent of ticket-fixing by police officers began to emerge from the intercepted conversations, the court will address the circumstances surrounding the initial decision to wiretap Officer Bencosme’s phone on December 23, 2009 (Target Mobile Telephone [TMT] 12). There is a distinction between the initial actions of the investigators and the actions that followed the discovery of extensive police and delegate involvement in ticket-fixing because the Bencosme order followed the inadvertent disclosure of one instance of ticket-fixing in the course of an ongoing and independent investigation employing eavesdropping that was in no way concerned with police ticket-fixing. The fact that the early determination was made under a different mind-set than the eavesdropping applications that followed later once the dimension of ticket-fixing emerged; the fact that eavesdropping on police officers was initiated after the first evidence of ticket-fixing was disclosed pursuant to a wiretap directed at different individuals, with a different objective, and that is not challenged by the defendant litigants here (and not challenged on necessity grounds by the defendants affected by those orders); and the fact that the District Attorney’s Office did not launch an investigation of ticket-fixing from a blank slate, but instead had evidence of such conduct thrust upon it during an unrelated interception together inform the question of necessity as it bears on the entire spectrum of those eavesdropping orders later issued by this court expressly directed at widespread police ticket-fixing.
Thus, the prosecutors went up on a wire to investigate Jose Ramos, at the time a police officer with numerous extracurricular interests, along with Lee King, a reputed drug dealer, commencing on or about January 9, 2009, and under the direction of Internal Affairs Bureau (LAB) (because of Ramos’ New York Police Department [NYPD] association) Detective Randy Katakofsky. The investigation began with a request for installation of pen registers and trap and trace devices as to King’s mobile phone, and initially related to a sale of large quantities of marijuana from a barbershop owned by Ramos. By February 2009, Katakofsky had accumulated enough evidence to seek ap *416 propriately an eavesdropping warrant on King’s phone,[4] and thereupon, the wiretap led to evidence of numerous other crimes in which Ramos was involved, and consequent wiretap orders as to additional lines throughout 2009. Ramos was indicted for many of those crimes, some quite serious, along with other members of the Barbershop Organization.
In the course of intercepting Ramos’ phone conversations in October and November 2009,[5] the investigators heard a series of conversations between Ramos and Police Officer Virgilio Bencosme pertaining to the quashing of two summonses written by New York City police officers. In these conversations, Bencosme is heard to tell Ramos that the summonses would be “taken care of.” These various discussions led to the issuance of a wiretap order on TMT 12, Bencosme’s phone, on December 23, 2009. Though it was known, or at least inferred, that Bencosme could not accomplish his objective alone, the extent of involvement of other officers acting at Bencosme’s request or direction was then unknown. Therefore, as the investigators pursued Bencosme through a wiretap, there was no basis for believing that this aspect of the Ramos investigation would ultimately displace that investigation’s objectives with a new and heretofore unrelated investigation. At most, the investigators could imagine that there was some other officer/delegate involvement but that Ramos alone was at the center of this conduct, and that Bencosme’s subsequent conversations involving criminal activity would be with Ramos or someone related to Ramos’ criminal activities.
This perspective alone justifies the investigators seeking, and the court granting, an order to intercept Bencosme’s conversations over TMT 12 without raising any new necessity issues, or requiring any additional necessity recitations. At this point, the focus on Bencosme was simply an unexpected but fully connected aspect of the Ramos investigation, and the People, in prior orders, clearly established that normal law enforcement methodology would be futile. Until later, when the interactions *417 between the various PBA delegates were revealed through ongoing interceptions, the investigators would likely view this as a limited corruption in which a rogue cop — Ramos—was the instigator and a small number of other officers were his enablers. The importance of this early history of the investigation and the natural and unexceptional extension of eavesdropping in this investigation to Bencosme’s line is that they establish that the necessity of wiretap measures as to TMT 12 had already been established at the time the People sought authorization to eavesdrop on this line.
This conclusion does not relieve the People from having to justify the continuing use and expansion of eavesdropping to include the additional phones up to TMT 28. There was a point, undoubtedly, when the investigators realized that they were not dealing with an isolated few instances of a PBA delegate working in concert with Ramos, but rather that Ramos was tapping into an inclusive network of delegates, and a practice that was apparently long-standing and ingrained in the minds of many officers as an implicit privilege of service if not an outright perk. Indeed, in the course of the yearlong investigation of conversations relating to ticket-fixing, the number of officers of various rank and assignment who were implicated in the practice by their own words vastly exceeded the number of officers ultimately indicted by the Bronx District Attorney. Thus, there came a time when the investigation here changed dramatically, with ticket-fixing taking over from the Ramos investigation.[6] The court has endeavored to review the necessity requirement as it uniquely pertains to this broader investigation, but remains mindful that eavesdropping was already legally (and necessarily) in effect when the true character and extent of the criminal acts became known.
With respect to the objectives of the ticket-fixing investigation, the Valdez affidavit lists as its objectives the identification of all members and the procurement of evidence necessary to *418 prosecute all members of the conspiracy to commit grand larceny in the fourth degree (see Valdez aff ¶ 10). This broadly stated goal was an appropriate one in light of the fact that ticket-fixing by members of the NYPD involved a breach of the public trust. Once the true nature of ticket-fixing was understood, it was appropriate for the investigation to pursue the uncovering and prosecution of a widespread pattern of ticket-fixing, and not just the indictment of Bencosme and Ramos. Moreover, the goal being a wide-ranging investigation and prosecution, secrecy was therefore of paramount importance.
This goal could only be achieved by the use of eavesdropping. This is so because the crime being investigated, which involved the removal of summonses from the police precincts where they were supposed to be filed, along with other methods of ticket-fixing, could only be understood by listening to the conversations that preceded the actions of the targets. Unlike certain crimes, such as murder, robbery, gun trafficking or narcotics trafficking, for which the actions of the perpetrators constitute evidence of the crime, ticket-fixing is a crime as to which the conversation itself is a crime and for which the actions of the ticket-fixers, without the communications that preceded them, are often ambiguous and susceptible to innocent explanation. For example, if a police officer removes a ticket from the box where such ticket was supposed to be filed, or a police officer fails to attend or suffers a loss of memory at a hearing on a moving violation, these actions, without more, would not establish that a crime had been committed. Only the cell phone communications that preceded them could establish that these actions were not innocent and thereby enable a prosecution for them. Thus, the procurement of evidence of the communications between the ticket-fixers was essential to achieving the goals of the investigation.[7]
Aside from the nature of ticket-fixing, there is yet another significant factor as to why eavesdropping was especially neces *419 sary here — the targets of the investigation were police officers, who presumably possess a certain amount of training and expertise in the use and detection of conventional investigative techniques. Unlike investigations involving civilian targets, here, the use of many conventional investigative techniques would have created a heightened and unacceptable level of risk of compromising the secrecy of the investigation far short of its stated objective.
When the Valdez affidavit is viewed in light of these factors, it leads to the inescapable conclusion that no conventional investigative technique could feasibly have been utilized to achieve the goals of this investigation and that without eavesdropping it would have been virtually impossible for the investigators to procure sufficient evidence to enable a wide-ranging investigation of ticket-fixing.
With that backdrop in mind, the original Valdez affidavit, which was the foundation of the subsequent applications, although far from perfect, sufficiently established that eavesdropping was necessary to investigate ticket-fixing. Initially, the Valdez affidavit refers to surveillance operations and the inspection, review and interpretation of telephone records, Department of Motor Vehicles’ (DMV) records, and arrest reports as the conventional investigative techniques that were employed in the investigation prior to the request to eavesdrop on Bencosme’s phone. (See Valdez aff ¶ 32.) Valdez avers that because the ticket-fixing scheme was orchestrated through the use of cell phones, none of these techniques would enable the investigators to discover the criminal conduct underlying the termination of a summons, or to ascertain the substance of conversations between the coconspirators, and therefore were of limited utility in achieving the goals of the investigation. Similarly, in paragraph 34 of his affidavit, Valdez avers that a tracking device was not employed because, like physical surveillance, it would have little value where the criminal acts were accomplished through telephone conversations and text messages. Contrary to defendants’ claim, there is no reason for the court to believe these statements by Valdez are misrepresentations or that Valdez never undertook any of these actions. However, to the extent that defendants argue that none of these conventional investigative techniques were relevant to an investigation into ticket-fixing and to a determination of the necessity for eavesdropping to investigate ticket-fixing, the court concurs. The inclusion of these averments in the Valdez affidavit was un *420 necessary and clearly surplusage; however, they cannot fairly be characterized as evidence that Valdez recklessly or intentionally misled the court.[8]
With respect to two other conventional investigative techniques that were not attempted, but, at least, were relevant to the investigation into ticket-fixing — the use of a confidential informant and an undercover officer — the Valdez affidavit sufficiently demonstrates that they were reasonably unlikely to succeed. For instance, in paragraph 33 of the Valdez affidavit, Valdez maintains that the use of a confidential informant was not feasible because the confidential informant that had been used to ferret out Ramos’ criminal activities was not involved in Ramos’ ticket-fixing activities. And, in paragraph 36, Valdez states that the use of undercover police officers was not feasible, and, in any event, would not achieve the goals of the investigation. The court finds reasonable Valdez’s assessment regarding the earlier authorized interception of phone calls between Ramos and Bencosme that the use of an undercover was not feasible because it appeared that Bencosme only fixed tickets for people he knew or those who were introduced by people he trusted. In addition, the court agrees with the People that even if it was feasible to introduce an undercover to request that a ticket be fixed by Bencosme, such an undercover would be limited in his or her ability to identify all of Bencosme’s fellow ticket-fixers.[9] This is so because this was not a conspiracy with *421 a centralized hierarchy and structure where all the participants were known to one another and worked together to achieve the goals of the conspiracy. Here, the motorists did not appear to know the ticket-fixers, and the officers requesting that a ticket be fixed did not typically know the PBA delegate who would actually be the one who fixed the ticket.
In addition to contending that the IAB investigative team was required to use undercovers and informants, defendants also contend that the applications at issue were deficient because several other investigative techniques, not mentioned in the Valdez affidavit, were never attempted. Specifically, defendants claim that the investigators could have: interviewed or issued grand jury subpoenas to the police officers and civilians who had been mentioned on the prior Ramos wiretaps as having engaged in ticket-fixing; audited the individual precincts to determine which summonses were missing; and conducted video surveillance inside the precincts to determine the identity of any officer who removed a summons. Even without the advantage of hindsight, it is easy to see why none of these measures would have come close to achieving the goals of the investigation. As the People point out, confronting the police officers who were believed to have engaged in ticket-fixing was more likely to expose the investigation than to obtain their cooperation.[10] Surveillance cameras, if they could be secreted in the precinct without detection, would not likely capture the serial number of any summons that had been removed, and certainly would not allow investigators to ascertain who requested that the ticket be removed. Similarly, because there are a myriad of reasons as to why a summons would be missing, audits would be of little use in achieving the goals of the investigation.[11]
*422 In sum, when viewed in a practical and commonsense fashion and in the context of the objectives of the investigation into ticket-fixing, given the fact that ticket-fixing is a crime for which evidence is chiefly and most effectively derived from cell phone communications themselves, and that the targets of the investigation were police officers schooled in conventional investigative techniques, it is clear that the People have satisfied CPL 700.20 (2) (d) and 700.15 (4) by amply demonstrating that (aside from creating the risk of disclosure) normal investigative techniques, though less intrusive than eavesdropping, would not suffice to uncover the scope of the ticket-fixing scheme. (See People v Rabb, 16 NY3d 145, 153 [2011] [“(a)n affidavit describing the standard techniques that have been tried and facts demonstrating why they are no longer effective is sufficient to support an eavesdropping order even if every other possible means of investigation has not been exhausted”].)
II. Preemption
Defendants concede that under New York law, grand larceny in the fourth degree is a designated offense for which eavesdropping may be authorized. (See CPL 700.05 [8] [b].)[12] However, defendants maintain that because larceny is neither included in the federal wiretapping statute’s list of permissible crimes for which a state may authorize eavesdropping, nor a crime that is “dangerous to life, limb, or property,” under federal preemption law and the Supremacy Clause of the Constitution, this court did not have authority to order the instant eavesdropping. (See 18 USC § 2516 [2].) Defendants’ argument is unavailing.
In order to determine whether there was authority for the court to issue the eavesdropping warrants on Bencosme’s and *423 other police officers’ cell phones, the court, indeed, must decide whether the conduct of the defendants in fixing tickets can be fairly characterized as dangerous to life, limb or property. (See People v Shapiro, 50 NY2d 747, 763 [1980].) To be sure, the physical act of fixing a ticket is not inherently dangerous. However, the behavior that is encouraged by and could potentially flow from such conduct certainly is. The evidence adduced in the grand jury established that defendants fixed tickets by destroying them, by failing to file them, by not appearing to testify in traffic court, or by testifying falsely in traffic court. Some of the tickets so fixed were for reckless driving, failing to wear a seat belt, driving while talking on a cell phone, excessive speeding, failing to stop at a stop sign, parking at a fire hydrant, and failing to secure a child passenger with a seat belt.[13] As a result of having their tickets deleted, motorists were allowed to escape the consequences of their reckless roadway behavior. Having not paid a fine, having not had their insurance premiums increased as a result of their reckless conduct, or having not had their licenses to drive suspended, these individuals had no disincentive to discontinue their illegal and reckless driving. Viewed in this fashion, it is not difficult to see how ticket-fixing endangered both people and property. (See People v Principe, 65 NY2d at 37 [forgery, larceny and related crimes fell within the ambit of federal wiretapping law as crimes that are dangerous to life, limb or property where corrupt DMV employees provided forged certificates of title, driver’s licenses without road tests and inspection stickers without inspections].)
Moreover, this court had authority to authorize the instant eavesdropping under federal law because the evidence established that the ticket-fixing at issue here was done by public officials and was a result of a well-organized, established and pervasive scheme involving offenses, including suborning perjury in traffic court, that are intrinsically serious. (See People v Principe, 65 NY2d at 38.)
For these reasons, the activities described in the instant applications for eavesdropping were within the scope of both federal and New York law governing eavesdropping.
*424 III. Probable Cause
Defendants’ next claim that the Valdez affidavit in support of the December 23, 2009 warrant was lacking in probable cause is equally unavailing. Initially, only Bencosme, Anthony, Mc-Guckin, O’Reilly, Rodriguez and Scott have standing to challenge this warrant on this ground because only these defendants either had a propriety interest in the phone line or were overheard during the course of the eavesdropping on this phone line. (See CPL 710.10 [5]; 710.20 [2]; CPLR 4506 [2]; People v Hanks, 87 AD3d 1370 [4th Dept 2011]; People v Fonville, 247 AD2d 115 [4th Dept 1998].) Even assuming all of the defendants have standing pursuant to People v Kramer (92 NY2d 529 [1998]), on the merits, defendants’ motion is denied.
Initially, the court notes that upon issuing the warrant on Bencosme’s phone it previously found probable cause to believe that Bencosme had used and would continue to use this phone line in furtherance of the crime of grand larceny in the fourth degree and conspiracy or attempt to commit this crime. There is nothing in defendants’ motion to alter the court’s prior determination. The Valdez affidavit relied on a series of conversations in October and November 2009 between Ramos and Bencosme that were intercepted pursuant to court-authorized eavesdropping on Ramos’ cell phone. These conversations clearly establish that Ramos had requested that Bencosme fix two tickets on behalf of two individuals known to Ramos. The conversations were not in code and the words and meanings were clear to both the monitoring officers and to this court that Ramos and Bencosme were discussing fixing tickets and that Bencosme would be contacting another police officer in order to do so. Quite clearly, these intercepts established probable cause to believe that future communications between Bencosme and Ramos or Bencosme and another police officer or delegate, concerning the designated crime of grand larceny in the fourth degree, would be obtained by eavesdropping on Bencosme’s cell phone.
IV FrankslAlfinito Hearing
The statements relating to necessity contained in the affidavits in support of the eavesdropping warrants were neither intentionally nor recklessly false or misleading. As stated above, the affiants specifically addressed the various challenges in investigating ticket-fixing within the NYPD and they provided reasons, with sufficient specificity, regarding why eavesdropping was necessary to achieve the objectives of the investigation. *425 Contrary to defendants’ assertions, there is no evidence that the affiants perjured themselves by misrepresenting facts regarding the investigation. To the extent that the language regarding necessity in the later affidavits associated with the ticket-fixing eavesdropping warrants was the same as, or similar to, language in the earlier affidavits which authorized eavesdropping to investigate Ramos’ barbershop activities, it was appropriate because the ticket-fixing investigation grew out of the barbershop investigation, and the reasons that certain investigative techniques would be of no avail had not changed.[14] However, as stated earlier (see supra at 419-420), even if certain of the averments relating to necessity were simply recycled from the Ramos warrants, it would be of no moment because those averments were irrelevant and immaterial to the court’s determination of the necessity to eavesdrop on Bencosme. Thus, defendants have failed to satisfy their burden of establishing that the warrant affidavits at issue contained intentionally or recklessly made material falsehoods or material omissions.[15] (See Franks v Delaware, 438 US 154, 155-156 [1978] [defendant must make a substantial preliminary showing that the false statement was included in the affidavit by the affiant knowingly and intentionally and the false statement was necessary to the finding of probable cause]; People v Fonville, 247 AD2d 115 [4th Dept 1998] [in challenging the veracity of the affiant, defendant must show that the affiant knowingly or recklessly made a materially false representation or misleading omissions of material fact].)
*426 V. Retroactive Amendments
Defendants’ final claim for suppression of some of the intercepted conversations is based upon the People’s alleged failure to retroactively amend the warrants to cover interceptions for offenses not designated in those warrants. This claim too is devoid of merit.
Initially, defendants claim that the People failed to retroactively amend with respect to the so-called “Paint Store Incident.” With respect to this incident, the People adduced evidence before the grand jury that defendants Regan, Peralta, Manara and Scott, four members of the NYPD, conspired to conceal an assault that was committed by Michael Loturco (separately indicted) on October 20, 2010. On September 22, 2010, this court authorized the interception of communications over Police Officer Scott’s cell phone in order to obtain evidence relating to the crime of tampering with public records. All of the interceptions relating to the paint store incident that defendants Regan, Peralta and Scott seek to suppress involve the falsification of police reports relating to this incident which clearly falls under the umbrella of tampering with public records. Therefore, though the exact amendment itself may not have been anticipated, these communications were “otherwise sought” and fall within the ambit of the eavesdropping warrant on Scott’s phone. Consequently, no amendment was required. (See CPL 700.65 [4] [retroactive amendment required only when a communication that is intercepted is not otherwise sought]; People v Di Stefano, 38 NY2d 640, 651 [1976] [amendment required when an incriminating conversation that is totally unrelated to the crime for which the warrant was issued is overheard]; People v Wakefield Fin. Corp., 155 Misc 2d 775 [Sup Ct, NY County 1992] [amendment not required for the crime of enterprise corruption where eavesdropping authorized for falsifying business records, offering a false instrument for filing, Felony Martin Act violations, and conspiracy to commit those crimes].)
The same can be said with respect to the interceptions relating to the crimes of official misconduct, obstruction of governmental administration and criminal solicitation. All of the interceptions relating to these crimes involved the ticket-fixing scheme and were also related to the crimes of grand larceny in the fourth degree and tampering with public records in the first degree for which authority to eavesdrop had been authorized by this court. Because these interceptions were “otherwise *427 sought,” none of these interceptions fell outside the scope of the existing warrants, and therefore amendment for them was unnecessary. (Id.)
Based on all the foregoing reasons, defendants’ motion to suppress the evidence obtained by eavesdropping is denied in its entirety.

. Throughout the decision the word “fix” is used to describe the different ways that defendants made parking and traffic tickets a nullity, thereby ensuring that the driver or owner of the vehicle that was ticketed did not face any consequences for his or her conduct.

. Defendants contend that all of the warrants authorized subsequent to the Bencosme warrant were based on the evidence derived from the Bencosme warrant; therefore, they argue if the Bencosme warrant failed to establish necessity or probable cause, then all of the evidence obtained pursuant to the Bencosme warrant and all subsequent warrants must be suppressed as fruit of the poisonous tree. It should be noted with respect to the warrants authorizing eavesdropping subsequent to the Bencosme warrant, defendants have failed to demonstrate that these warrants should be evaluated differently than the Bencosme warrant with respect to the issue of necessity.

. This court signed the Bencosme warrant and all subsequent warrants pertaining to the ticket-fixing investigation. Now, with the benefit of both time for reflection and the input of zealous and highly competent counsel for the defendants, the court undertakes a de novo review of its prior orders.

. It is beyond the scope of this decision to analyze this initial wiretap of TMT 1, but the court has examined the basis for issuance of that order, including the necessity requirement, the probable cause requirement, and all other relevant requirements, and we proceed to our consideration of the orders here in issue (TMT 12 through 28) satisfied that the orders involving Ramos and King were lawfully issued.

. The interception of conversations involving ticket-fixing and the preservation of these conversations were authorized by an order granting a retroactive amendment of the existing order involving Ramos’ phone.

. There is one significant exception to the ticket-fixing focus of the investigation. As had earlier occurred, another crime involving officers who were being monitored in connection with ticket-fixing landed in the laps of the investigators. A civilian named Loturco, the owner of New Palace Paints, assaulted one Ferdinand Ayala on October 20, 2010, at the paint store, and thereafter sought the assistance of Officer Christopher Scott, who was being monitored on TMT 15, to intervene on his behalf to prevent his arrest. As a result of various acts in support of Loturco, a police sergeant and three officers were indicted for various crimes related to dereliction of their duties, and Loturco was indicted for assault.

. This is especially so given the ubiquity of cell phones in our culture. Today, most people communicate about all matters — -professional and personal, legal and illegal — -via cell phone conversations or text messages. Moreover, it appears from all that we have learned about the conduct of the various PBA members and other officers that the cell phone was the instrumentality of the crime in that, unlike face-to-face contacts, where an approached officer or PBA member might be suspicious of undercover activity and therefore cautious with respect to any illegal agreements, the cell phone provided a level of perceived isolation, anonymity, and protection in fashioning unlawful agreements. There is no basis to conclude that officers would be as unguarded and open in a face-to-face conversation using an undercover.

. Although the Valdez affidavit does not provide details regarding how these techniques were employed, there is simply no basis for the court to conclude that they, in fact, were not so employed. In this regard, the People attach as exhibit 2 to their opposition papers an affidavit from former Assistant District Attorney Jan Kum, who was involved in the investigation from December 2008 until November 2010. The Kum affidavit also does not provide details regarding how these techniques were employed; however, it does provide corroboration for the fact that these investigative techniques, in fact, were attempted. In any event, as stated above, because these techniques are irrelevant to an investigation into ticket-fixing, whether these techniques were attempted is of no moment with respect to the court’s determination of necessity.

. As noted, through the interception of communications subsequently it became apparent to the IAB investigators that the fixing of tickets was orchestrated by PBA delegates. The People attempt to use this fact to buttress their argument that an undercover could not have been successfully employed. This post hoc information cannot be used as a basis for establishing necessity to eavesdrop on Bencosme’s phone, but as discussed above, regarding the eavesdropping order signed as to TMT 12, before the true dimensions of the ticket-fixing conduct were known, the People need not justify the absence of an undercover at that moment. With respect to the warrants signed *421 subsequent to the Bencosme warrant, such evidence is relevant to determining the necessity for these eavesdropping warrants, and, indeed, with respect to these later warrants, provides further support for the People’s claim that employing an undercover was not feasible to investigate ticket-fixing being conducted at the delegate level.

. Although defendants argue that police officers who failed to cooperate with the investigation would have much to lose by such refusal, it is also true that the culture of the NYPD is such that officers are reluctant to do so. Indeed, there were a number of actions taken by police officers to foil the investigation. In this regard, the court notes that a police lieutenant assigned to IAB is separately indicted for disclosing the existence of the instant eavesdropping and investigation into ticket-fixing within the NYPD.

. The fact that in prior cases involving police corruption, wiretapping was not utilized is of no moment with respect to the necessity for eavesdrop *422 ping here. Each investigation is unique and the necessity for eavesdropping must be evaluated within the context of the particular investigation. Here, the unique nature of ticket-fixing and the almost exclusive reliance upon cell phones to commit this crime distinguish this investigation from earlier ones involving police corruption in which wiretapping was not utilized. The conversation that leads to other criminal actions — the acceptance of bribes, the stealing of seized contraband, etc. — is not central in establishing that a crime has occurred. The substantive criminal acts that ensue speak for themselves. The conversation that leads to ticket-fixing, however, is effectively the corpus of the crime as it puts in motion actions that are not detectable themselves as criminal — the loss of memory or the misplacement of a summons.

. That ticket-fixing amounts to grand larceny is based on the removal of the summonses from the precincts where they were supposed to be filed. (See Penal Law § 155.30 [2].)

. When reviewing whether eavesdropping is authorized for a designated crime, the court can look at the entire record. (See People v Principe, 65 NY2d 33, 36-37 [1985] [in reaching its determination that eavesdropping was authorized for forgery, larceny and related crimes, the Court reviewed the evidence presented to the grand jury, including the recorded conversations].)

. Although the intercepted conversations between Ramos and Bencosme, which formed the basis of probable cause to eavesdrop on Bencosme’s cell phone, pertained solely to ticket-fixing, given the evidence of Ramos’ other corrupt activities that had already been procured, it was not unreasonable for the investigators to believe at that point in the investigation that Bencosme may be somehow linked to Ramos’ other illicit schemes. However, it was not before too long that the investigators should have realized that Bencosme was not involved in any of Ramos’ other activities. Thus, the necessity averments in the initial Bencosme warrant, which were not expressly directed at ticket-fixing, were subsequently updated by the District Attorney. The court notes that the District Attorney has documented changes and adjustments made in the December 23, 2009 application with respect to the claim of necessity. These adjustments reflect updated information and are tailored to necessity issues pertaining to Bencosme and ticket-fixing generally.

. The court, having reviewed the NYPD’s file of all disciplinary matters relating to Detective Randy Katakofsky, an affiant on many of the eavesdropping applications relating to the ticket-fixing investigation, finds that none of these matters cast doubt on the veracity of Katakofsky’s assertions regarding the necessity for eavesdropping.