[1 NYS3d 746]

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v JOSEPH ANTHONY, VIRGILIO BENCOSME, JASON CENIZAL, MICHAEL HERNANDEZ, MARC MANARA, et al., Defendants.

Supreme Court, Bronx County, January 12, 2015

### APPEARANCES OF COUNSEL

*Dechert LLP* (*Edward McDonald* and *Matthew Mazur* of counsel) for defendants.

*Robert T. Johnson, District Attorney* (*Stuart Levy* and *Mary Jo Blanchard* of counsel), for plaintiff.

### OPINION OF THE COURT

STEVEN L. BARRETT, J.

All of the above-named defendants are New York City police officers and/or Patrolmen's Benevolent Association delegates or trustees who have been indicted and charged with various crimes related to the illegal fixing of summonses given for parking and moving violations. On November 19, 2013, this court denied defendants' initial motion to suppress evidence obtained through the use of court-authorized eavesdropping. (*See People v Anthony*, 42 Misc 3d 411 [Sup Ct, Bronx County 2013].) This court gave defendants permission to file a second motion to suppress the eavesdropping evidence on the ground that the People failed to comply with the constitutional and statutory requirement to minimize the interception of non-pertinent communications. Defendants now move to suppress approximately 3,000 telephone calls and 1,225 text messages, which were intercepted as a result of eavesdropping on 17 target cell phones belonging to 14 Bronx police officers between December 23, 2009 and December 14, 2010.[1] In the alternative, defendants seek a hearing with respect to the People's compliance with the minimization requirement. For the reasons set forth below, defendants' motion to suppress is denied, without a hearing.[2]

The minimization requirement has its underpinnings in the Fourth Amendment's prohibition of unreasonable searches and

---

1. The 3,000 telephone calls and 1,225 texts cited above refer to the pertinent communications that were intercepted. In total, 77,555 telephone calls and 112,300 text messages were intercepted. (*See* defendants' exhibit H.)

2. For the convenience of the court defendants filed a single, consolidated motion. However, as defendants acknowledge, each individual defendant has moved to suppress only the communications for which he has standing to challenge—those communications intercepted on his own phone and any communications intercepted on another person's phone to which he is a party.

seizures and its mandate that search warrants contain provisions particularly describing the place to be searched and the persons or things to be seized. (*People v Floyd*, 41 NY2d 245, 249 [1976], citing *Berger v New York*, 388 US 41 [1967].) To satisfy these constitutional concerns, CPL 700.30 (7) requires that an eavesdropping warrant contain a provision that the authorization to intercept shall be conducted in such a way as to minimize the interception of communications not otherwise subject to eavesdropping under article 700. Minimization has been defined as a good faith and reasonable effort to keep the number of non-pertinent calls intercepted to the smallest practicable number. (*Id.* at 250.) The reasonableness of the People's efforts requires a case by case analysis of the particular facts surrounding the interception. (*Scott v United States*, 436 US 128, 137-139 [1978].) Courts have identified the following factors that bear on the analysis of whether the People's efforts to minimize were reasonable: (1) the scope of the investigation; (2) the duration and nature of the conversations; (3) the character and sophistication of the targets of the investigation; (4) the extent of official supervision of the surveillance; and (5) the possibility and practicality of determining, contemporaneously with their interception, whether particular conversations are in fact pertinent to the objectives of the investigation. (*See People v Brenes*, 42 NY2d 41, 46-47 [1977].) On a motion to suppress eavesdropping evidence, the burden lies with the People to go forward to demonstrate the legality of the police conduct in the first instance, but it is the moving defendant who shoulders the burden of persuasion. (*People v Di Stefano*, 38 NY2d 640, 652 [1976].)

With these legal principles in mind, and after an examination of the copious materials submitted in connection with the motion,[3] the court is satisfied that the People have demonstrated that appropriate procedures were established to minimize interception of non-pertinent communications, that a conscientious effort was made to follow such procedures, and that defendants have failed to show that there was an unreasonable interception of a substantial number of non-pertinent communications.

---

3. The court has reviewed defendants' motion and the 19 exhibits attached thereto; the People's response and 32 exhibits attached thereto; defendants' reply, the People's surreply and three exhibits attached thereto; defendants' memorandum of law in response to the People's surreply and three exhibits attached thereto; and finally, the People's affirmation in response to defendants' memorandum of law and two exhibits attached thereto.

The People have made a prima facie showing of compliance with the minimization requirement. In their response to defendants' motion, the People have included a 21-page affirmation of Assistant District Attorney (ADA) Mary Jo Blanchard together with 32 exhibits detailing the efforts that were made to minimize non-pertinent interceptions of both telephone conversations and text messages. Included in the exhibits are affidavits from former ADA Jan Kum, who was the lead attorney of the investigation between December 2008 and November 2010, and Detective Randy Katakofsky, who was assigned to the Internal Affairs Bureau and was the officer in charge of the wire room. (See People's exhibits 3, 5.) Initially, the court notes that each of the eavesdropping warrants contained the statutory language of CPL 700.30 (7) that the interception of non-pertinent calls be minimized, and each warrant was supported by an affidavit that contained a provision explaining to the court the minimization procedures that would be utilized, including the "two minutes on, one minute off" method of spot monitoring telephone conversations.[4] Throughout the course of the eavesdropping on the target officers, the court was kept apprised of the People's minimization efforts via the provision of regular progress reports to the court.

Additionally, according to the Katakofsky, Kum and Blanchard affidavits/affirmation, each monitoring officer was instructed on the minimization procedures before he or she began surveillance duties. Each officer was provided with written minimization instructions and was also instructed orally by ADA Kum or another assistant. After reviewing the written instructions and listening to ADA Kum's lecture, each officer signed the written instructions, which were then posted in the wire room. The written instructions were prepared at the outset of the investigation, when the focus was upon the illegal activities of Police Officers Jose Ramos and Lee King, which included, amongst other activities, the sale of large quantities

---

4. This method of spot monitoring authorized the monitoring officers to listen and record conversations for up to two minutes in order to determine if the conversations were pertinent. After two minutes, if it was determined that the conversation was not pertinent, then the officers were to turn off the equipment for one minute. After one minute elapsed, the officers were allowed to reactivate the recording equipment for an additional 15 seconds to determine if the conversation was pertinent. If the conversation still was not pertinent, the pattern could be repeated. During the initial two-minute period, if it was determined that the conversation was not pertinent, the recording equipment was to be turned off before the end of the two-minute period.

of marijuana. Thus, the written instructions were prepared at a time when Lee King's telephone was the target of the eavesdropping and the designated crimes pertained to the sale and possession of marijuana, and not to ticket-fixing.

The written instructions included general provisions relating to the spot monitoring of telephone conversations and how to handle privileged communications, conversations between unknown persons, and conversations involving crimes other than the crimes designated in the warrant. (*See* People's exhibit 4; defendants' exhibit E.) As the court detailed in its November 19, 2013 decision, in December 2009, when the court issued the wiretap order with respect to defendant Bencosme's phone, the investigation had transformed from one that had focused on Ramos' illicit conduct to one that focused on ticket-fixing. (*See People v Anthony*, 42 Misc 3d at 414-415.) And, although the People did not reissue written instructions with updated information regarding the new targets and new crimes for which eavesdropping had been authorized, they did convey the change in the focus of the investigation to the monitoring team. According to the Kum and Katakofsky affidavits, when the court signed the Bencosme warrant on December 23, 2009, Detective Katakofsky informed the monitoring officers of the new target associated with this phone line and that the monitors were now authorized to listen for evidence of grand larceny in connection with ticket-fixing. Over the course of 2010, as the investigation expanded to include additional officers engaged in ticket-fixing, Detective Katakofsky and ADA Kum instructed the monitoring officers with respect to the minimization protocols for any new targets and any new crimes and advised them that conversations relating to ticket-fixing were considered pertinent. (*See* People's exhibits 3, 5.) In addition, Detective Katakofsky posted signs in the wire room reflecting the fact that ticket-fixing conversations were pertinent, and he provided the monitoring officers with handouts, which were kept next to the monitoring officers' computer terminals, identifying the telephone numbers associated with the new police officer targets of the investigation. (*See* People's exhibits 6, 7, 9, 10.)

With respect to text messages, the People concede that there were no specific written minimization instructions given. However, the procedure that was implemented was to autho-

rize only Detective Katakofsky to read the intercepted texts.[5] (*See* People's exhibit 5.) Katakofsky would read the entire text sometime after it was received and recorded, and if he determined that a text message was pertinent, he would mark it so and then would share it with the rest of the investigative team. Non-pertinent texts were marked by Detective Katakofsky as non-pertinent and were not shared with other members of the team. (*See* People's exhibit 5.)

All of the above establishes that the People had an appropriate plan to minimize the interception of non-pertinent communications and that a conscientious effort was made to implement that plan. Further support for this conclusion is provided by a statistical breakdown of the percentage of non-pertinent calls that were minimized compared to those that were not minimized. With respect to calls that lasted over two minutes, 88.9% of the non-pertinent interceptions were minimized.[6] (*See* affirmation of Mary Jo Blanchard in support of People's surreply ¶ 14.) This evidence provides compelling support for the proposition that there was a high degree of compliance with the procedures established to restrict the interception of non-pertinent calls. (*See People v Floyd*, 41 NY2d at 252 [where 6.5% of the non-pertinent calls were not minimized, the Court found that such a small percentage supported the People's position that there was a reasonable and conscientious effort to comply with the procedures established to achieve minimization]; *United States v Willis*, 890 F2d 1099, 1102 [10th Cir 1989] [denial of motion to suppress eavesdropping evidence affirmed where 70% of non-pertinent calls over two minutes were minimized]; *United States v Prada*, 1991 WL 161323, 1991 US

---

**5.** From time to time, other monitoring officers would assist Detective Katakofsky by providing Katakofsky with the texts; however the other officers did not actually read the texts. (*See* People's exhibit 5, ¶ 25.)

**6.** This figure is the overall average minimization rate for all the telephone lines that were included in the analysis. It includes: calls where the caller was placed on hold for a significant period of time; calls that were transferred to new callers; retrieval of multiple voicemail messages; and technical malfunctions. (*See* affirmation of Mary Jo Blanchard in support of People's surreply ¶ 17.) It also includes conversations that were ambiguous, and thus the monitoring officers could not make a pertinency determination within two minutes. Moreover, if one were to include telephone calls that lasted over two minutes and 15 seconds, which would take into account the 9-10 seconds for a telephone to ring twice prior to a call being answered and the 3-5 seconds from when the speakers end their conversation until the audio channel is closed, the average minimization rate for non-pertinent calls would rise to 94.6%. (*See* affirmation of Mary Jo Blanchard in support of People's surreply ¶¶ 15, 16.)

Dist LEXIS 11199 [SD NY, Aug. 13, 1991, No. 90-Cr-306-S-1 (KMW)] [motion to suppress eavesdropping evidence denied where 50-73% of the non-pertinent calls over two minutes were minimized].)[7] In light of all of the above evidence, the court concludes that the People have satisfied their burden of establishing prima facie compliance with statutory and constitutional minimization requirements.

Defendants argue that the eavesdropping evidence should be suppressed because: (1) the written minimization instructions did not reference ticket-fixing; (2) the two minutes on, one minute off method of minimization was not reasonable in the context of this investigation; (3) privileged calls between defendants and their spouses and between defendants and their attorneys were intercepted; (4) text messages were intercepted in their entirety and no effort was made to minimize non-pertinent texts; and (5) thousands of texts were either withheld from the defense, not recorded or destroyed. All of these claims are devoid of merit.

(1)

As detailed above, the monitoring officers were properly instructed regarding the categories of non-pertinent communications. The People have established that the monitoring officers were constantly updated regarding new targets and new crimes being investigated. Consequently, the fact that the written minimization instructions handed out and posted at the outset of the investigation did not refer to ticket-fixing or the police officer targets is of no moment with respect to whether the People's plan regarding minimization was appropriate.

(2)

Moreover, the spot-monitoring method of minimizing telephone conversations that was utilized here was reasonable

---

7.  Contrary to defendants' contention, the fact that only a small percentage of the intercepted conversations and text messages were found to be pertinent is of no moment when evaluating the People's efforts to minimize the interception of non-pertinent communications. As the People point out, the percentage of pertinent calls and texts demonstrates merely how frequently a defendant used his phone in furtherance of the commission of a crime and is not indicative of any lack of efforts to minimize the interception of non-pertinent communications. What is more telling is that defendants have not contested the above-cited statistical evidence, have not identified the specific communications (other than a few involving a spouse or law office) that should have been minimized and were not, and have not claimed that the pertinence assessment was fundamentally and substantially flawed.

under the circumstances of this investigation. Because the vast majority of the calls were under two minutes and the majority of them were not pertinent, a large number of calls that were not pertinent flew under the established minimization procedures. Therefore, defendants claim, the two minutes on, one minute off rule was inappropriate and "it behooved investigators to adopt stricter procedures to minimize the interception of non-pertinent communications." (*See* affirmation of Edward McDonald, Esq. at 11, ¶ 47.) Initially, the court notes that there is no constitutional or statutory requirement that calls two minutes and under be minimized. (*See United States v Capra*, 501 F2d 267, 276 [2d Cir 1974]; *United States v Bynum*, 485 F2d 490, 500 [2d Cir 1973].) Indeed, the Court in *Scott* noted that it is not unreasonable for the monitoring agents to intercept large numbers of non-pertinent calls when the conversations are short or when they are ambiguous in nature. (*See Scott v United States*, 436 US at 140; *People v Floyd*, 41 NY2d at 252-253 ["brief calls do not lend themselves to minimization"].) In addition, where the investigation is directed toward discovery of the participants in what appears to be a wide-ranging practice or even a broad conspiracy, then a greater degree of intrusion may be tolerated. (*See People v Floyd*, 41 NY2d at 251-252.)

Here, the monitoring officers had an adequate basis to listen to calls for up to two minutes. In addition to calls from fellow officers to request tickets be fixed, the requests sometimes came from individuals with whom the defendants had a close relationship (relatives, friends, neighbors). Thus, it was not unreasonable for the monitoring officers to take the view that no caller was above suspicion and that some small talk would precede a request to make a ticket disappear. Moreover, the targets of the investigation were seasoned and savvy New York City police officers, many of whom had knowledge of the rules regarding minimization and were aware that they could attempt to prevent the interception of pertinent conversations by engaging in innocent banter prior to discussing anything illicit. Indeed, a few of the intercepted conversations revealed an explicit intention to speak for a period of time regarding personal matters before discussing the actual, less innocent reason for the call.[8] Thus, under these circumstances, it was entirely reasonable to spot monitor the telephone conversations for up to

---

8. The People provided evidence that the existence of the wiretaps had been leaked to defendants and a police lieutenant recently has been convicted

two minutes in order to determine if the conversation was pertinent. (*See People v Floyd*, 41 NY2d at 249 [Court acknowledges that crime-related conversation is often prefaced by innocent chatter and finds that some intrusion may take place before a determination of pertinency can be made].)

(3)

The monitoring officers also made good faith efforts to minimize privileged conversations. As stated above, the monitoring officers were given written and oral instructions not to intercept privileged communications, including those between attorney and client and those between spouses. When it became apparent that one of the targets was speaking to an attorney, Detective Katakofsky immediately informed ADA Kum. (*See* People's exhibits 3, 5.) After consulting her supervisors, ADA Kum then instructed Detective Katakofsky that a call to or from a person known or recognized to be an attorney could be spot monitored using the two minute on, one minute off method only if the monitors determined that the conversation did not concern the speaking officer's own case. If the conversation concerned the speaking officer's own case, ADA Kum instructed the monitoring officers to immediately cease interception as soon as that determination was made. In addition, Detective Katakofsky provided a handout to each monitoring officer, which contained the telephone numbers of those attorneys that the officers frequently consulted. (*See* People's exhibits 3, 5.) Defendants point to three conversations between defendant Anthony and an attorney as illustrative of the People's failure to minimize attorney-client conversations. (*See* defendants' exhibits K, L, M.) However, as the People point out, in all of these conversations the speaking officer (defendant Anthony) was referring to cases involving other officers, and not cases of his own. Thus, none of these conversations was privileged and therefore each could be spot monitored using the two minute on, one minute off method.[9]

---

of engaging in such a leak. (*See* n 12, *infra*.) Also, the People provided transcripts of two intercepted calls between defendant Anthony and a fellow officer that revealed their intention to engage in prefatory, idle conversation. Call 2349—"We gotta talk for a minute before, if we're gonna talk business." Call 7037—"Just be careful dude, that's all I'm telling you. Just have a minute conversation before you fuckin talk to anybody about anything." (*See* People's exhibit 26.)

9. Although not specifically cited by the defense, the People concede that six conversations between defendant Hernandez and his attorney, pertaining

With respect to spousal communications, the monitoring officers were equally solicitous. Before interception commenced with respect to ticket-fixing, Detective Katakofsky attempted to determine whether the police officer targets were married. (*See* People's exhibit 5.) Although it took some time before the monitoring officers could ascertain from the interceptions who, in fact, was married, once it was so determined, with few exceptions, the conversations with spouses were minimized immediately.[10] (*See* People's exhibit 22 [chart detailing the spousal conversations minimized].) As with defendants' claim regarding attorney-client conversations, the weakness of defendants' contention regarding spousal conversations is made readily apparent by the dearth of examples provided by defendants of privileged spousal communications that were not properly minimized. The two conversations provided as illustrative examples by defendants (*see* defendants' exhibits I, N), conversations between defendant Payan and his wife and defendant Anthony and his wife, were of short duration, were quickly minimized, and are hardly suggestive of a pattern of noncompliance with the statute.

(4)

With respect to the interception of text messages, notwithstanding the fact that they were intercepted in their entirety, the court finds that the procedure implemented by the People to protect defendants' privacy interests was reasonable. Unlike telephonic communications, due to their nature, text messages are not susceptible to spot monitoring. Text messages are most

---

to Hernandez's own case, were intercepted. However, five of the six calls were under two minutes (37, 37, 22, 102, and 82 seconds) and minimized either immediately after it was ascertained that Hernandez was speaking to his attorney or when it was determined that Hernandez was discussing his own case. The sixth call was erroneously spot monitored using the two minute on, one minute off standard.

**10.** Some of the exceptions included conversations between defendant Hernandez and Police Officer Annette Gasperi. Although Detective Katakofsky learned that they were married, communications were intercepted in which Hernandez told others that his wife, who was a highway safety officer, engaged in ticket-fixing herself, and thus, the monitoring officers were instructed to spot monitor conversations between Hernandez and Gasperi. (*See* People's exhibit 5.) Because these conversations provided a basis for believing that Gasperi was aiding and abetting the ticket-fixing conspiracy, it was reasonable for the supervising ADA to advise the monitoring officers that these conversations did not fall within the marital privilege and therefore could be spot monitored. In any event, in their instant motion, defendants did not specifically cite these conversations as examples of the monitoring agents failure to properly minimize spousal communications.

often only a few words, and, at most, a few sentences. Thus, it is not practicable to spot monitor a text. It is unreasonable to expect the monitoring officers to have read only the first several characters of the text, avert their eyes to the middle characters, and then read only the final characters. Such a procedure would defy logic and common sense and is not required by the statute. Rather, the monitoring team did all that could be reasonably expected. Detective Katakofsky, the supervising officer of the wire room, was the only monitoring officer that reviewed text messages for pertinency. Although this procedure did not prevent him from reading the entire text message as part of his preliminary screening, it ensured that other monitoring agents and government lawyers did not read the nonpertinent texts at all. (*See United States v McGuire*, 307 F3d 1192 [9th Cir 2002] [interception of entire fax transmissions upheld based on procedure where each fax printed out and reviewed by monitoring agent and assistant United States attorney for pertinency].)

Defendants object to this procedure based upon the one case that has addressed the propriety of intercepting text messages, *United States v Neadeau* (2009 WL 2155680, 2009 US Dist LEXIS 59546 [D Minn, July 13, 2009, No. 09-Cr-126(1) (DWF/ RLE)]), a case in which the District Court denied suppression of intercepted text messages. The text communications were intercepted in their entirety, but were provided to a separate group of text monitoring agents for review, who were not otherwise involved in the investigation. Relying on *Neadeau*, defendants claim that instead of having Katakofsky review the text messages, a separate "taint team" of monitoring officers, who were not otherwise involved in the investigation, should have been utilized to determine if the text messages were pertinent or privileged. Defendants' reliance on *Neadeau* is misplaced. In *Neadeau*, the District Court denied suppression finding that the procedure utilized was objectively reasonable, not that it was constitutionally mandated. Although *Neadeau* offers guidance with respect to an option available to law enforcement to minimize the interception of text messages, it does not create a binding rule requiring the use of separate taint teams. Indeed, the court believes that the procedure followed here—having the officer with the most in-depth knowledge of the case do the preliminary screening of the intercepted text messages—was the most sensible and practicable approach to the review of text messages under the unique circumstances

of this case. Text messages here were very often extremely short messages that were responsive to earlier telephone conversations or texts. Thus, without an in-depth knowledge of the investigation at hand, especially one as broad as the ticket-fixing investigation, a reviewing officer would have no accurate way of determining the relevancy of a particular text message.[11] Moreover, by limiting the review of text messages to Detective Katakofsky, the People took reasonable measures to limit the disclosure of non-pertinent texts and thus adequately protected defendants' privacy interests. (*See United States v McGuire*, 307 F3d at 1201.) Thus, under the circumstances of this case, the procedure utilized here was reasonable. (*See Scott v United States*, 436 US at 132 [based on widespread conspiracy eavesdropping upheld although officials intercepted virtually all communications taking place on a particular telephone line]; *People v Brenes*, 42 NY2d at 47 [in a rare case, if it is the only practicable procedure available to minimize non-pertinent conversations, even automatic and continuously operating recording machines might constitute a reasonable effort to comply with the statute]; *People v Floyd*, 41 NY2d at 250 n 4 [where a large-scale, far-flung conspiracy is in progress and the government is seeking to discover the scope of the conspiracy and the identity of those involved, the interception of all communications may be justified].)

(5)

With respect to defendants' final contention that thousands of communications were either withheld from the defense, not recorded or destroyed, based upon the affirmation of ADA Mary Jo Blanchard (at 16-21), the court is satisfied that all the telephone calls and text messages that were intercepted were recorded and turned over to the defense, and that the People did not withhold, alter, or delete any interceptions. Defendant's claim that calls were intercepted but not monitored is based on nothing more than sheer speculation.

In sum, the court finds that the submissions by the People established that good faith and reasonable efforts were made to keep the number of non-pertinent calls and text messages intercepted to the smallest practicable number, and finds to be

---

11. The two examples of text messages that defendants cite as illustrative of personal exchanges that should have been minimized in actuality illustrate the difficulty in attempting to minimize text messages. None of the messages contain a complete sentence and the longest message contains 99 characters. (*See* defendants' exhibits O, P.)

meritless defendants' contention that the minimization efforts put forth by the prosecutors leading the investigation, and implemented by the monitoring officers, were so lacking that all of the eavesdropping evidence obtained should be suppressed. Moreover, no hearing is required: defendants' motion falls far short of overcoming the People's prima facie showing of compliance with the statute and fails to demonstrate that a substantial number of non-pertinent calls were intercepted unreasonably. (*See* CPL 710.60 [3] [b]; *United States v Cirillo*, 499 F2d 872, 880-881 [2d Cir 1974] [in the absence of any evidence that a substantial number of non-pertinent conversations had been intercepted unreasonably, the district court was justified in denying suppression without holding a hearing]; *United States v Prada*, 1991 WL 161323, 1991 US Dist LEXIS 11199 [SD NY, Aug. 13, 1991, No. 90-Cr-306-S-1 (KMW)] [no minimization hearing necessary in light of the broad scope of the conspiracy and statistical evidence establishing that the large percentage of calls over two minutes had been minimized]; *United States v Feola*, 651 F Supp 1068, 1099 [SD NY 1987, Brieant, Ch. J.] [no hearing required where defendants failed to include specific conversations that were not minimized].)[12] Accordingly, defendants' motion to suppress the evidence

---

**12.** Defendants' claim for a hearing based upon the testimony of Detective Katakofsky at the recent trial of *People v Jennara Cobb* (index No. 3306/11) at which the Honorable Martin Marcus presided, is devoid of merit. Initially, the court will not entertain defendants' claim based upon the disclosure during the *Cobb* trial of any medical or mental health condition for which Katakofsky may be currently receiving treatment. This is so because any disclosures to defense counsel here regarding Katakofsky's condition were made in violation of protective orders issued by this court, as well as the Honorable Michael Gross (made before the trial of *People v Ramos*, index No. 3297/11). The records of all the proceedings regarding these protective orders, including those before the Honorable Martin Marcus during the *Cobb* trial, were sealed or should have been sealed. Thus, any information regarding Katakofsky's condition never should have been disclosed to defense counsel for the above-named defendants. In any event, even if the court were to entertain this claim, Katakofsky's current medical condition and treatment are irrelevant to the issue of whether minimization was properly implemented in 2010, and also have no bearing on Katakofsky's ability to recall the facts set forth in his affidavit made in support of the instant motion. Equally unavailing is defendants' claim regarding Katakofsky's testimony at the *Cobb* trial as defendants have failed to identify any testimony at that trial that suggested that Katakofsky neglected to adhere to the minimization plan. Indeed, contrary to defendants' assertion, Katakofsky's testimony at the *Cobb* trial regarding the interception of communications relating to ticket-fixing demonstrated that he correctly understood that any and all conversations relating to ticket-fixing were pertinent and should be intercepted.

obtained by eavesdropping for failure to minimize non-pertinent interceptions is denied without a hearing.